*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
September 08, 2025
9:15 AM

Plaintiff-Appellee,

v

No. 371264
Calhoun Circuit Court
LC No. 2022-002448-FC

BREANNA LYNN COGER,

Defendant-Appellant.

Before: MARIANI, P.J., and MALDONADO and YOUNG, JJ.

PER CURIAM.

Defendant, Breanna Lynn Coger, appeals by leave granted[1] her September 20, 2023 *nolo contendere*-plea conviction of second-degree child abuse,[2] MCL 750.136b(3). Coger's plea did not include a sentencing deal and on December 8, 2023, she was sentenced to 30 to 120 months' imprisonment with credit for two days served. On appeal, Coger argues the trial court erred by assessing 10 points each for offense variables (OVs) 1, 4, and 10, and that she is entitled to resentencing because rescoring any one of these OVs would change her minimum guidelines sentencing range. We disagree and affirm.

## I. FACTUAL AND PROCEDURAL HISTORY

Coger, a single mother, lived with her 13-month-old son QC ("the victim"), in an apartment in Battle Creek. On October 31, 2021, the victim had been sick with Adenovirus[3] and had diarrhea.

---

[1] *People v Coger*, unpublished order of the Court of Appeals, entered July 18, 2024, (Docket No. 371264).

[2] Coger was originally charged with first-degree child abuse, MCL 750.136b(2), but her *nolo contendere* plea was made in exchange for the lesser conviction.

[3] Adenovirus is a respiratory infection producing common cold or flu-like symptoms, and sometimes diarrhea. Center for Disease Control, *About Adenovirus* <https://www.cdc.gov/adenovirus/about/index.html> (accessed April 22, 2025).

Coger was also informed that day that she lost her job and needed to pick up her last check. She also needed a trip to the store to get household items but was having trouble with her van. Coger began calling family members asking for a ride, but none would help her and she grew frustrated. Coger's friend finally agreed to give her a ride. After Coger was able to secure a ride, the victim had diarrhea and feces were all over his body, his clothes, and the carpet.

Coger was in a rush to clean the victim and get him dressed in time for her friend's arrival, but her story regarding what happened next changed over time. Coger initially stated she took the victim to the bathroom to rinse the feces off his body and then redrew a bath of lukewarm water, checking the water temperature before placing the victim in the bathtub. When asked how she turned on the faucet, Coger said there was a specific spot on the dial she usually set the temperature to, but did not remember if she set the dial that day. Coger later changed her story, admitting that despite knowing the water in the apartment could get extremely hot, having burned herself before while washing dishes, she cranked the dial to the highest heat the water could go, let the bathtub fill up to about five inches, and placed the victim in the bathtub without first checking the water temperature.

When Coger placed the victim in the bathtub, she told law enforcement and medical professionals that he was whining or whimpering, and that as soon as she left the bathroom, the victim began screaming. The water was still running and the victim was still screaming as Coger gathered things to dress the victim and prepared herself to head out shopping. At one point, Coger left the apartment building to retrieve something from her van. She left the victim in the bathtub for about five minutes total, and despite hearing his screaming, did not return before she was finished readying herself and the victim's clothes to leave the apartment.

When Coger returned to the bathroom, the victim had escaped the tub and was on the bathroom floor "crying excessively." Coger reached for what she thought was toilet paper wrapped about the victim's feet and ankles, only to realize it was his skin. When Coger's friend arrived, she drove Coger and the victim to the Emergency Department at Bronson Battle Creek Hospital, where the victim was treated for a few hours before being transferred to the Pediatric Intensive Care Unit (PICU) at Bronson Children's Hospital in Kalamazoo.

The next day, the victim was examined in the PICU by Dr. Sarah Brown, a board certified child abuse pediatrician at Bronson Children's Hospital. According to Dr. Brown's physical examination, the victim was left with "full thickness or third degree burns on his feet and ankles meaning his skin was destroyed . . . ." There was a clear line at about five inches up his legs where the burns above the line were of a lesser severity. The victim had second-degree burns on the back of his legs, his genitalia, and his hands up to his wrists. Dr. Brown testified the burn pattern was consistent with immersion in hot liquid, and the victim would have needed to be submerged "for a minute or two" in 140-degree water for the burns on his feet to reach the severity of third-degree burns. Had the water temperature been only 120 degrees, third-degree burns would not have been possible.

While in the PICU, the victim screamed very loudly from extreme pain. Every time the dressing on his burns needed to be changed, he continued to scream in pain despite being sedated with anesthesia. Dr. Brown further testified: "[the victim] was certainly distressed which can be quite typical for children in the intensive care unit environment but what we, specifically, noticed

was that [the victim] was easier to console when only hospital staff were around as compared to when his mother was around." Nursing staff also noted that they were the ones consoling the victim, and Coger never tried to soothe him. The victim eventually needed skin grafts. Dr. Brown opined that his "feet will never be normal and that he will have chronic issues with the skin and soft tissues of his feet for the rest of his life."

Battle Creek Police Department Detective Cody Longon was notified of potential child abuse involving Coger and the victim on the basis of the victim's presentation to the Emergency Department at Bronson Battle Creek Hospital. On November 2, 2021, Coger consented to Detective Longon searching the apartment and examining the scene in the bathroom. Detective Longon could still see remnants of skin in the shape of handprints and "bodily fluid" on the bathroom floor and the tub. Longon could also see small hand prints on the rim of the tub. When speaking with Coger about what happened, Detective Longon felt this was more than an accident, and was borne out of Coger's frustration with trying to find a ride, her caretaking responsibilities as a single mother, the lack of support from family members, and that the victim had a diaper blowout in the midst of all this. Coger told Detective Longon that before this incident, she complained to the property manager at the complex about the water temperature to no avail. But when Detective Longon followed up with management at the apartment complex, there was no record of any complaint from Coger despite her having lived there for one year.

Detective Longon returned to the apartment complex on November 4, 2021 with a search warrant and a crime technologist. The building's maintenance worker, Tim Nestle, allowed Detective Longon to check the building's water heater in the boiler room to see that the temperature was set to 120 degrees. Detective Longon and the crime technologist returned to the apartment and turned on the bathtub faucet as hot as it could go. They allowed the water to fill the tub to a depth of five inches, which took five minutes and five seconds. At this depth, and after allowing the water to sit for one minute, the water temperature was 137 degrees. They turned the faucet back on and allowed the tub to fill to 7.5 inches, at which point the water temperature in the tub was 140 degrees, and the water coming out of the faucet was 145 degrees.

Coger was arrested on June 16, 2022 and charged with first-degree child abuse. In exchange for dismissal of this charge, Coger pleaded *nolo contendere* to second-degree child abuse. There was no sentencing agreement with the plea. At the outset of Coger's sentencing hearing, the trial court noted "it would be fair to say that the circumstances surrounding the instant offense are nothing short of appalling and deeply troubling." The trial court then heard objections to the contents of the presentence investigation report (PSIR) and the scoring of the guidelines. The trial court agreed with the prosecutor, over defense counsel's objection, that OV 1 should be scored at 10 points. The trial court also scored OV 10 at 10 points over defense counsel's objection. Coger had a prior record variable (PRV) score of zero points, and an OV score of 55, placing her at OV Level V. Her recommended minimum sentencing guidelines range was 19 to 38 months. Coger was sentenced near the top of her minimum guidelines range to a term of 30 to

120 months imprisonment, with credit for two days served. Coger filed her application for leave to appeal, which was granted by this Court.[4]

## II. ANALYSIS

On appeal, Coger argues there was insufficient evidence to assess 10 points each for OVs 1, 4, and 10, and that she is entitled to resentencing because rescoring any one of these OVs would change her minimum guidelines sentencing range. We disagree and affirm Coger's sentence.

## A. ISSUE PRESERVATION AND STANDARD OF REVIEW

"To preserve a sentencing issue for appeal, a defendant must raise the issue at sentencing, in a proper motion for resentencing, or in a proper motion to remand filed in the court of appeals." *People v Anderson*, 322 Mich App 622, 634; 912 NW2d 607 (2018) (quotation marks and citations omitted). At Coger's sentencing hearing, defense counsel objected to scoring OV 1 and OV 10. Defense counsel did not challenge the assessment of OV 4 at Coger's sentencing hearing, but later challenged the same in this Court in a motion to remand for resentencing. The motion to remand was denied without prejudice.[5] All issues raised by Coger are preserved for appellate review. *Anderson*, 322 Mich App at 634.

When reviewing alleged errors in sentencing, "the circuit court's factual determinations are reviewed for clear error and must be supported by a preponderance of the evidence." *People v Hardy*, 494 Mich 430, 438; 835 NW2d 340 (2013), superseded in part by statute as stated in *People v Rodriguez*, 327 Mich App 573, 579 n 3; 935 NW2d 51 (2019). A trial court's findings are clearly erroneous if, after review of the record, this Court is "definitely and firmly convinced" that the trial court made a mistake. *People v Armstrong*, 305 Mich App 230, 237; 851 NW2d 856 (2014). "Whether the facts, as found, are adequate to satisfy the scoring conditions prescribed by statute, i.e., the application of the facts to the law, is a question of statutory interpretation, which an appellate court reviews de novo." *Hardy*, 494 Mich at 438.

## B. OV 1

Coger challenges the scoring of OV 1 at 10 points, arguing water is not a weapon under OV 1 because it does not fall within the plain and ordinary meaning of an "instrument" or "device" used for attack or defense. We disagree.

OV 1 involves the aggravated use of a weapon, and is properly scored at 10 points where "[t]he victim was touched by any other type of weapon." MCL 777.31(d). The statute does not

---

[4] *People v Coger*, unpublished order of the Court of Appeals, entered July 18, 2024 (Docket No. 371264).

[5] See note 4 of this opinion. Following oral argument, Coger filed a renewed motion to remand, incorporating additional argument regarding the scoring of OV 4. Upon plenary review of that motion and the issues presented on appeal, we do not believe that a remand is necessary to the proper disposition of this appeal or would otherwise be warranted. Accordingly, Coger's renewed motion to remand is denied.

define "weapon." Accordingly, to construe the term, our caselaw has looked to "Michigan jurisprudence regarding the definition of 'weapon' as used in other criminal statutes as well as dictionary definitions[.]" *People v Hutcheson*, 308 Mich App 10, 14; 865 NW2d 44 (2014). From those sources, this Court has "concluded that the term 'weapon' should be defined as an article or instrument used for bodily assault or defense, or any instrument used for attack or defense in a fight or in combat"—with an "article" being "a thing or person of a particular and distinctive kind or class," and an "instrument" being "one used by another as a means or aid." *Id*. (cleaned up); see also, e.g., *People v Lange*, 251 Mich App 247, 257; 650 NW2d 691 (2002) (noting the dictionary definition of "weapon" as "any instrument or device used for attack or defense in a fight or in combat" and "anything used against an opponent, adversary or victim") (quotation marks and citation omitted).

Consistent with this broad definition, our caselaw has placed few categorical limits on what can constitute a "weapon" for purposes of OV 1; it can be "animate or inanimate," *Hutcheson*, 308 Mich App at 15, for instance, and dangerous by design or only when "turned to such purpose," *Lange*, 251 Mich App at 256 (quotation marks and citation omitted). It must, however, be something "distinct from" rather than "an integral part of" the offender—that is, not the offender's bare hands, *Hutcheson*, 308 Mich App at 15—and it must be "used as a weapon"—that is, "used against an opponent, adversary, or victim," *People v Ball*, 297 Mich App 121, 125-126; 823 NW2d 150 (2012) (concluding that OV 1 should not have been scored for the defendant's delivery of heroin to the victim who later fatally overdosed because, although heroin could be used as a weapon, there was no evidence that the defendant did so by, for instance, "forc[ing] the victim to ingest the heroin") (quotation marks omitted).

As this Court has also explained, this understanding of the term "weapon" comports with the statutory scheme of which it is a part. In its scoring rubric, MCL 777.31(1)(a)-(c) specifies various things can constitute a weapon: a "firearm"; "a knife or other cutting or stabbing weapon"; and "a harmful biological substance, harmful biological device, harmful chemical substance, harmful chemical device, harmful radioactive material, harmful radioactive device, incendiary device, or explosive device"—a list that includes various solids, liquids, and gases. See MCL 777.31(3)(a) (incorporating the definitions of these terms set forth in MCL 750.200h, which in turn expressly defines them to comprise "solid[s], liquid[s], or gas[es]"); MCL 777.31(3)(b) (defining "incendiary device" as "includ[ing] gasoline or any other flammable substance, a blowtorch, fire bomb, Molotov cocktail, or other similar device"). These expressly identified weapons, however, do not purport to represent an exhaustive and exclusive list for purposes of the statute; they are simply the weapons whose specified use merits a particular, heightened score. MCL 777.31(1)(d) then provides a lesser score of 10 points for being "touched by any other type of weapon"—a capaciously worded category that correspondingly "acts as a 'catch all' provision, showing the Legislature's intent to assess points for the use of weapons across the broadest possible range of circumstances, consistent with the goal of evaluating the appropriate sentence range for a particular defendant." *Lange*, 251 Mich App at 257-258.

Given the plain terms of MCL 777.31 and the caselaw that has interpreted them, we conclude that defendant's use of scalding water to harm the victim in this case was sufficient to demonstrate that "[t]he victim was touched by any other type of weapon" for purposes of OV 1. MCL 777.31(1)(d). The evidence demonstrated that defendant "used [the scalding water] against . . . [the] victim," *Ball*, 297 Mich App at 125 (quotation marks omitted), and we do

not see anything in the statute or caselaw that would categorically preclude scalding water from constituting "any other type of weapon"—a provision worded and intended to capture "the use of weapons across the broadest possible range of circumstances[.]" *Lange*, 251 Mich App at 257-258. The water was something used by defendant "as a means or aid" to inflict bodily harm on the victim, *Hutcheson*, 308 Mich App at 14 (quotation marks and citation omitted), and as discussed, the statutory scheme makes clear that a liquid can be a weapon. MCL 777.31(1)(b), for its part, does not suggest that it provides the exclusive list of liquids that might constitute a weapon under the statute as a whole—particularly in light of MCL 777.31(1)(d)'s accompanying and encompassing "any other type of weapon" language. See *Ball*, 297 Mich App at 123 (explaining that "[w]e construe an act as a whole to harmonize its provisions and carry out the purpose of the Legislature") (quotation marks and citations omitted). And while the fact that water is not necessarily dangerous or harmful in its unaltered state may disqualify it from warranting a 20-point score under MCL 777.31(1)(b), that alone doesn't mean it cannot be a "weapon" that warrants a lesser score under MCL 777.31(1)(d)'s "catch all." *Lange*, 251 Mich App at 257; see *id*. at 256 (explaining that a weapon can be something dangerous by design or only when "turned to such purpose"). See also, e.g., *People v Blunt*, 282 Mich App 81, 88-89; 761 NW2d 427 (2009) (concluding that hot cooking oil did not meet the specific definition of "harmful" required for a 20-point score under MCL 777.31(1)(b), but recognizing that "[v]irtually any liquid, from maple syrup to laundry detergent, may become a lethal weapon when boiled").

Because the evidence was sufficient to demonstrate that the victim in this case was "touched by any other type of weapon" when Coger used scalding water to harm him, MCL 777.31(1)(d), the trial court did not err by scoring 10 points for OV 1.

## C. OV 4

OV 4 evaluates psychological injury to a victim, and states 10 points shall be scored if a victim suffers serious psychological injury that "may require professional treatment." MCL 777.34(2). "[T]he fact that treatment has not been sought is not conclusive." *Id.* But "the fact that the victim was afraid at the time of the incident, by itself, does not give rise to a serious psychological injury requiring professional treatment." *People v White*, 501 Mich 160, 164; 905 NW2d 228 (2017) (cleaned up). "[A] trial court may not simply assume that someone in the victim's position would have suffered psychological harm because MCL 777.34 requires that serious psychological injury *occurred* to a victim, not that a *reasonable* person in that situation would have suffered a serious psychological injury." *Id*. at 163 (quotation marks and citation omitted).

In this case, Dr. Brown observed, when treating the victim at Bronson Children's Hospital, that "[the victim] was certainly distressed which can be quite typical for children in the intensive care unit environment but what we, specifically, noticed was that [the victim] was easier to console when only hospital staff were around as compared to when his mother was around." Here, the victim displayed a specific, negative emotional response *after* the incident while being in his mother's presence. Dr. Brown's statements about the victim's response while in the hospital may reflect ongoing trauma and fear resulting from the incident, but Dr. Brown did not state this on the record. Dr. Brown's observations of the victim's behaviors alone do not indicate by a preponderance of the evidence that the victim suffered serious psychological injury that may require professional treatment. See *id.*

This, however, was not the full extent of the evidence on the matter. The victim's adoptive mother also provided a victim impact statement giving insight into the victim's psychological injuries, wherein she wrote:

> Although [the victim] has been adopted into a loving and supportive home, the price the injuries have caused have affected his positive biological [familial] relationships. [The v]ictim has been affected mentally and suffers from PTSD. . . .

> Out in public, people will gasp at the sight of his feet if he takes off his socks. I feel the pain of my child daily and it breaks my heart for him to be looked at in this way.

> \* \* \*

> He has several developmental delays due to the trauma that will forever affect his life and his ability to live a normal existence.

> \* \* \*

> [The victim] will suffer from his injuries for his entire life both physically and psychologically.

The trial court considered this statement before sentencing Coger. Although the statement does not specify whether the victim engaged in psychological treatment, the statement is evidence that the victim suffered psychological injury that *may* require such treatment in the future. Thus, a preponderance of the evidence supported assessing 10 points for OV 4, and we find no clear error. See *Hardy*, 494 Mich at 438.

### D. OV 10

Next, Coger challenges the scoring of OV 10 at 10 points, arguing there is no evidence that she placed the infant in hot water to exploit for selfish reasons or to manipulate for unethical purposes. We disagree.

"Offense variable 10 is exploitation of a vulnerable victim." MCL 777.40(1). The sentencing court must assess 10 points if "[t]he offender exploited a victim's physical disability, mental disability, youth or agedness, or a domestic relationship, or the offender abused his or her authority status." MCL 777.40(1)(b). However, "[t]he mere existence of 1 or more factors described in [MCL 777.40(1)] does not automatically equate with victim vulnerability." MCL 777.40(2). The statute provides several definitions as follows:

> (b) "Exploit" means to manipulate a victim for selfish or unethical purposes. Exploit also means to violate section 50b of the Michigan penal code, 1931 PA 328, MCL 750.50b, for the purpose of manipulating a victim for selfish or unethical purposes.

> (c) "Vulnerability" means the readily apparent susceptibility of a victim to injury, physical restraint, persuasion, or temptation.

(d) "Abuse of authority status" means a victim was exploited out of fear or deference to an authority figure, including, but not limited to, a parent, physician, or teacher. [MCL 777.40(3)(b)-(d).]

In *People v Huston*, 489 Mich 451, 460-461; 802 NW2d 261 (2011), our Supreme Court explained that the grounds for assessing 10 points under MCL 777.40(1)(b) are "things that are largely outside of the victim's control." It also explained that "vulnerability" "may arise not only out of a victim's [inherent or personal] characteristics, but also out of a victim's relationships or circumstances." *Id*. at 464. In *People v Ziegler*, 343 Mich App 406, 413; 997 NW2d 493 (2022), this Court held "the definition of 'exploitation' intrinsically establishes an element of intent: any manipulation must have been done with a *goal* of accomplishing something selfish or unethical." "The significance is clear: for purposes of OV 10, 'exploitation' means the defendant intended to gain something from the manipulation of the victim at some kind of cost to the victim." *Id.*

At sentencing, defense counsel objected to the assessment of 10 points for OV 10, arguing there was no evidence in the record that the victim was exploited, and the fact someone is a victim does not automatically mean they were exploited. The prosecution responded that OV 10 was properly scored because the facts supported the conclusion that Coger acted selfishly when she left the victim in the bathtub for several minutes, knowing he was in pain because he was screaming and crying. The prosecution argued the victim's infancy made him vulnerable. The trial court found:

> Having reviewed the information contained in the presentence investigation as well as the information provided to the [c]ourt by the parties, I do find that offense variable ten is scored properly and this is a very difficult judgment call on behalf of the [c]ourt, there is no question in the [c]ourt's mind that the [d]efendant in this case acted selfishly. That's clear from the information provided that the child was crying, that the cries continued, that she walked away because she couldn't handle what was going on with the child[,] leaving the child in a position where clearly based upon the child's behavior he was distraught. It is manipulation that the [c]ourt is struggling with. But under the circumstances putting him into that hot bath and then not going to get him[,] leaving him there to cry, I do believe qualifies as manipulative as it relates to trying to change his behavior or letting him cry it out or something other than attending to his immediate needs. So I'm going to allow [OV 10] to continue to be scored as is.

Based on this record, the trial court did not clearly err when scoring 10 points for OV 10. See *Hardy*, 494 Mich at 438. The trial court opined that Coger was selfish because she ignored the victim's screaming and crying because she was frustrated, and needed a break from him so she could ready herself to leave the house. She did not attend to his immediate need to get out of the bathtub because, as the trial court described, she was "trying to change his behavior or letting him cry it out or something other than attending to his immediate needs." And Coger's own admissions establish the following: (1) she just lost her job, she was having issues with her van, none of her family members would give her a ride, and she was incredibly frustrated; (2) despite knowing the water in the apartment could get excessively hot, and she had burned herself washing dishes before, Coger turned the water as hot as the faucet would allow it to go, and placed the victim in the tub; and (3) the victim began screaming as soon as she left the bathroom and she could hear him

screaming while she was getting ready to leave the apartment to go shopping. Coger even went to her van to grab something while the victim was left screaming, and she did not return until she was done getting ready.

Detective Longon and Dr. Brown both felt, after speaking with Coger, that she placed her son in scalding water out of frustration over all the unfortunate things that were happening to her that day, and her frustration was made worse by the victim's diaper blowout that got all over his clothes and the apartment carpet. The facts establish that Coger placed the victim in scalding water to give herself an outlet for her frustrations and a break from her caretaking responsibilities. Those goals were only attainable because of the youth and size of the victim. As Dr. Brown explained, the victim would have needed to use extraordinary survival measures to escape from the bathtub at his age. Thus, the record reflects that Coger exploited a vulnerable victim by placing him in a bathtub that was filling with dangerously hot water and that he could not easily climb out of, thereby trapping him in a harmful situation with the goal of "accomplishing something selfish or unethical." *Ziegler*, 343 Mich App at 413. We find no error in the fact-finding done by the trial court, or in its ultimate conclusion that the facts as found support the scoring of OV 10 by a preponderance of the evidence.

Affirmed.

/s/ Philip P. Mariani
/s/ Allie Greenleaf Maldonado